## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| JACOB THOMAS, and JTURBO ENGINEERING & TECHNOLOGY, LLC. | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| JOULE PROCESSING, LLC. and PLUG POWER, INC. | § § § | |
| Defendants | § § § | |

_____

## PLAINTIFFS' ORIGINAL COMPLAINT
_____

Plaintiffs, JACOB THOMAS and JTURBO ENGINEERING & TECHNOLOGY, LLC, (collectively the "Plaintiffs"), file this *Plaintiffs' Original Complaint*, to bring direct and derivative claims against Defendants, JOULE PROCESSING, LLC., and PLUG POWER, INC. (collectively, the "Defendants") and would respectfully show as follows:

### I.      NATURE OF THE ACTION

1.      This is a lawsuit involving the development of hydrogen liquefaction technology. Specifically, the technology at issue can liquify hydrogen using significantly lower kilowatts (kWH) per kilograms (kg) of liquid hydrogen, which is 50% lower than other liquefaction technologies in operation or development. The method for such liquefaction, and more efficient processes of liquefaction, was developed by Plaintiff Jacob Thomas ("Thomas") and is owned by Plaintiff JTurbo Engineering & Technology, LLC ("JTurbo").

2.      Although there is a United States patent obtained by Plaintiff, which is very specialized and specific, the technology discussed in this Complaint are Mr. Thomas' trade secrets

which he developed to increase energy efficiency in the liquefaction industry, and which are not disclosed or claimed in the patent.

3.      Defendants Joule Processing ("Joule") and Plug Power ("Plug") have misappropriated that technology by using it without compensating Plaintiffs as agreed in the four contracts between Plaintiffs and Defendants, a figure totaling around $11,200,000. Defendants have thereby breached each of these contracts.

4.      Defendant Plug is a successor in interest to Joule, as Plug acquired Joule and assumed it contracts.

5.      Jacob Thomas and JTurbo seek relief under the following federal question counts, each of which are addressed in this Complaint:

   a.   The DEFEND TRADE SECRETS ACT

6.      Thomas and JTurbo also seek relief under Texas state law, specifically,

   a.   The TEXAS UNIFORM TRADE SECRETS ACT;

   b.   Breach of Contract;

   c.   Tortious Interference of Prospective Business Relationship; and

   d.   Unfair Competition.

## II.      JURISDICTION AND VENUE

7.      This Court has original federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiff has asserted a cause of action arising under the laws of the United States, specifically 18 U.S.C. § 1836 (Defend Trade Secrets Act).

8.      This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 to hear Plaintiffs' other causes of action, all of which are so related that they form part of the same case or controversy under Article III of the United States Constitution.

9.      This Court has personal jurisdiction over Defendant Joule as Defendant is in and carries on its business in the State of Texas. Defendant Joule is headquartered in Harris County, Texas within the Sothern District of Texas.

10.      This Court has personal jurisdiction over Defendant Plug as it carries or carried on its business in the State of Texas. Defendant has engaged with business with both JTurbo and Joule, who are both Texas limited liability companies, and Plug has even purchased Joule which maintains its principal place of business in Harris County, Texas within the Southern District of Texas. Furthermore, all or a substantial portion of the events giving rise to this claim have occurred or will continue to occur in the Southern District of Texas.

11.      Venue in this Judicial District is proper under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(b) because this Complaint shows that the ends of justice require that other parties residing in any other district be brought before this Court.

## III.    PARTIES

12.      Plaintiff, Jacob Thomas ("Thomas") is a citizen of the State of Texas and resides in Fort Bend County, Texas.

13.      JTurbo Engineering & Technology, LLC ("JTurbo") is a limited liability company duly organized under the laws of the State of Texas, is in good standing, and is domiciled in Fort Bend County, Texas.

14.      Defendant Joule Processing, LLC. ("Joule") is a Texas limited liability company doing business in Harris County, Texas and may be served through its registered agent, Bradley W. Rapp, 1980 Post Oak Blvd., Suite 1200, Houston, Texas 77056, or wherever it may be found.

15.      Defendant Plug Power, Inc. ("Plug") is a corporation doing business in Latham, NY and may be served through its registered agent, CT Corporation System, 1999 Bryan St., Suite

900, Dallas, Texas 75201, or at its office location of 968 Albany Shaker Road, Latham, NY 12110, or wherever it may be found.

## IV.    FACTUAL BACKGROUND

16.    JTurbo is a provider of process technology and consulting services in the energy industry.

17.    It is also a developer of hydrogen and liquefied natural gas ("LNG") liquefaction technology.

18.    Jacob Thomas is the Founder and President of JTurbo Engineering and Technology, LLC. Thomas developed hydrogen and liquefied natural gas liquefaction technology for JTurbo. This would include the trade secrets and process simulations claimed in this complaint.

19.    JTurbo, by assignment from Thomas, owned certain trade secrets, know how, and improvements and enhancements to the technology and designs used to develop hydrogen liquefaction plants (collectively "JTurbo H2L IP").  The JTurbo H2L IP technology trade secrets also included process simulations, the different process data, and vendor lists.

20.    This Complaint does not seek relief under Thomas' patent, but seeks recovery on those engineering technology, know how, selection of equipment packages relative to process facilities generally, and the processes he developed for facilities, and sold through JTurbo, to enhance production at liquefaction process facilities.

21.    JTurbo's patents are the mechanism and process that liquefies hydrogen gas. However, JTurbo's trade secrets, including the methods and deliverables, make the process of liquefying hydrogen more efficient and less costly.

22.    This is a general description of Thomas / JTurbo's trade secrets.

23.     Thomas charges his clients for his experience and consulting acumen, which includes both his time and expenses. Joule, in turn, retained Thomas's consulting services.

24.     Joule Processing, a predecessor in interest to Plug, is an engineering, process equipment and services, company that sought to enhance the efficiency of liquefaction processing.

25.     JTurbo was contacted by Thomas's old employer, Fluor Corporation ("Fluor"), to contract with Joule for a Natural Gas Liquid (NGL) Recovery project (a cryogenic process that removes natural gas from liquids).

26.     Prior to JTurbo reaching out to Joule, Joule had virtually no experience in the Cryogenic Liquefaction Technology industry.

27.     On or about October 2020, Joule was attempting to develop a proposal for a company called Navitas for a Natural Gas Liquid (NGL) Recovery project.

28.      Because Joule lacked experienced engineers to perform and converge the process simulation for the Navitas Project, they turned to Thomas, who had ample experience in cryogenic processing.

29.      To consult and promote their business prospects for NGL Recovery and Nitrogen Rejection Unit project proposals, Joule actively retained Thomas's services.

30.     On or about February 8, 2021, Joule requested JTurbo's help with a proposal to H2 Renewables in early February 2021. Although JTurbo prepared the proposal, they did not share the process simulation. Instead, they only walked through it during production of the proposal.

31.     Thomas developed the process simulations on Joule's server for the H2 Renewables to help Joule. However, the process simulations were under lock and key. Thomas had his own user profile that was locked and protected from any other user from seeing the process simulations. No other user was allowed access to Thomas's unless the administrator override Thomas's user profile.

32.     Then, on or about April 18, 2021, JTurbo began providing certain trade secrets, know-how, process simulations, vendor selections, and contacts with their original equipment

manufacturer and research and development group on hydrogen liquefaction as part of an exclusive package and provider agreement that advanced JTurbo's and Joule's mutual interests. Additionally, prior to JTurbo providing those trade secrets and process simulations, Joule and JTurbo entered into a non-disclosure agreement on or about April 1, 2021. *See* Exhibit 1. This was because Joule and JTurbo anticipated entering an exclusive worldwide joint venture partnership to exploit Thomas' technology with Joule's market contacts, a joint venture and collaboration that would greatly benefit both parties.

33.     After providing JTurbo's trade secrets to Joule on or about April 2021, Joule engaged Fluor, as a subject matter expert, to validate JTurbo's H2L IP liquefaction technology.

34.     Joule had neither the technological expertise nor experience to properly evaluate Thomas and JTurbo's simulation and determine if it would increase efficiency and costs of proposed liquefaction units.

### The Original Exclusivity Agreement

35.     After Fluor validated Thomas' process, on or about April 29, 2021, JTurbo and Joule entered into an Exclusivity Agreement for Joule to be the exclusive worldwide packager and provider for JTurbo's H2L IP technology. *See* Exhibit 2 (Original Exclusivity Agreement).

36.     To induce Plaintiffs into signing the Exclusivity Agreement, Joule promised to develop clients to license the JTurbo H2L IP technology and process simulations and that Plaintiffs would be compensated for any hydrogen liquefaction plants that would use the JTurbo H2L IP technology and process simulations.

37.     Plug Power is a company engaged in the development of electrolysers and hydrogen fuel cell systems that replace conventional batteries in equipment and vehicles powered by electricity. Plug also had no experience in Cryogenic Liquefaction Technology.

### September 29, 2021 The Design Fee Agreement

38. On or about May 2021, Plug discussed with Joule and JTurbo its desire to develop a Hydrogen Liquefier to complete their value chain. After discussions, Plug and JTurbo entered into a non-disclosure agreement. *See* Exhibit 3. On or about September 29, 2021, JTurbo met with Joule's representatives, including Chuck Laughter. *See* Exhibit 4.

39. During the meeting Joule and JTurbo agreed that Joule would pay JTurbo a Technology and Design Development Fee whereby JTurbo would receive $500,000 per unit using the JTurbo H2L IP technology and process simulations and designs JTurbo created for Joule. *See* Exhibit 4.

> 2. The agreed "**LH2 technology development assistance fee**" for J-Turbo is $500k/unit ordered by Plug Power for up to the first three units.

40. Pursuant to the Design Fee agreement, Joule was to pay JTurbo $500,000 for developing a process design that would be similar to JTurbo's H2L IP technology.

41. The Design Fee Agreement was to design both a 15 ton per day (tpd) and a 30 tpd hydrogen liquefaction plant units, which would include JTurbo's nitrogen pre-cooling cycle design coupled with the process liquefaction cycle design. Unbeknownst to JTurbo, Plug had ordered three units of hydrogen liquefaction plants from Joule on or around the time of this discussion.

42. Plug and Joule knowingly sought out JTurbo because of JTurbo's innovative hydrogen liquefaction technology that has a 50% lower specific energy consumption (SEC), which is JTurbo's H2L IP technology. However, JTurbo solely developed the process liquefaction cycle design without any input from Plug or Joule.

43. Seeing the potential of JTurbo's H2L IP liquefaction technology and process designs, Plug engaged with Dr. Jacob Leachman, a well-known hydrogen expert from Washington University and Atlas Copco R&D expander manufacturer to validate JTurbo's hydrogen liquefaction technology. *See* Exhibit 5.

*The Amended Restated Exclusivity Agreement*

44.     On or about January 10, 2022, JTurbo and Joule signed and executed an Amended and Restated Exclusivity Agreement ("Amended Exclusivity Agreement"), which superseded the Exclusivity Agreement executed on April 29, 2021. *See* Exhibit 6 (Amended Exclusivity Agreement).

45.     Around the time of the Amended Exclusivity Agreement, Plaintiffs and Defendants all enter into Non-Disclosures Agreements (NDA) to protect the intellectual property rights and trade secrets, know how, process simulations, and improvements and enhancements of the JTurbo H2L IP technology from becoming known to the public. *See* Exhibit 3. Plaintiffs and Defendants also executed NDAs with third parties that would be evaluating or wanting to know more about the technology. *See* Exhibits 7, 8, 9, 10, 11, 12, and 13.

46.     All the NDAs signed by Plaintiffs, Defendants, and third parties were all mutual NDAs. The purpose of these NDAs was to protect both parties' confidential information, which includes proprietary information but also trade secrets, from being disclosed to the public.

47.     Plug saw the potential of JTurbo's H2L IP liquefaction technology. On or about January 2022, Plug acquired Joule to use the JTurbo H2L IP technology. *See* Exhibit 14.

48.     Joule was worth around $2 million to $5 million before JTurbo shared their trade secrets, know-how, process simulations, designs, and vendor lists. Plug acquired Joule, who was a small engineering company for around $190 million. This was primarily because of the JTurbo H2L IP technology and process designs. Now Plug did not have to go through Joule to obtain the JTurbo H2L IP technology and process designs.

49.     When Plug bought Joule, Plug became successor in interest and assumed Joule's agreements with JTurbo, which are the Design Fee Agreement and the Amended Exclusivity Agreement.

50.     JTurbo shared the JTurbo H2L IP technology, process simulations vendor lists, and process designs with Defendants as part of their mutually beneficial business relationship for the purpose of fulfilling their obligations under the Amended Exclusivity Agreement.

51.     Defendants failed to compensate Plaintiffs per the terms of the Amended Exclusivity Agreement. Joule agreed to license certain H2 liquefaction technology from JTurbo. That technology was described in paragraph 2.a of the Amended Agreement as the "JTurbo H2L IP", attached as Exhibit 6 hereto. The provision included:

a.   Trade Secrets and know-how related to the JTurbo H2L IP as it existed on the Effective Date;

b.   Improvements and enhancements made solely by JTurbo to the JTurbo H2L IP as they existed on the Effective Date;

and

c.   Any other protectible Intellectual Property obtained by JTurbo or its Affiliates in the future alone or in collaboration with Joule.

52.     The Amended Exclusivity Agreement provided that JTurbo would license the JTurbo H2L IP to Joule, and that Joule, in turn would sublicense the JTurbo H2L IP to each client. *See* Exhibit 6, paragraph 4. It provided for the possibility that JTurbo would provide the process engineering design services to Joule, who will then in turn provide it to potential clients.

53.     JTurbo was supposed to be compensated for each Project, through (1) License Fees and (2) the projects for which JTurbo provided the process engineering design services, called "PDP Fees." "Project" is defined in paragraph 1.h. of the Amended Exclusivity Agreement, meaning a hydrogen liquefaction project using JTurbo H2L IP, which in turn, can also include contemplated stand-alone liquefaction plant units.

54. Fees were negotiated separately for each Project. JTurbo would negotiate its licensing fee with Joule, and then Joule and JTurbo would jointly negotiate the sublicensing fee directly with each customer. *See* Exhibit 6, paragraph 4.a. The license fees paid to JTurbo by Joule were a condition of sale on each Project. JTurbo's licensing fee on each Project was capped at 5% of the Ex Works purchase price for each H2 liquefaction plant.[1] The parties defined this price as the "H2L Equipment Price." *See* Exhibit 6, paragraph 4.a. If JTurbo provided the process engineering design services, its fees were to be commercially reasonable and capped at 1% of the H2L Equipment Price.

55. Joule also promised in both the Original and Amended Exclusivity Agreement that Joule would generate at least $5 million in gross revenue for JTurbo within 5 years. *See* Exhibit 6 (Paragraph 11.b). To date, the Amended Agreement has not been terminated.

56. On or about January 2023, Joule received three more orders of liquefaction plants units using the JTurbo H2L IP from Nikola and TC Energy. Again, these orders were discussed without JTurbo's knowledge or compensation of the fees based on the Amended Exclusivity Agreement.

57. It is known to JTurbo that the current process designs of the six hydrogen liquefaction plant units are the same designs that JTurbo developed for Defendants. Which have been confirmed by engineers working at Defendants and the vendors that were selected by JTurbo.

58. Upon information and belief, Defendants are working with the same vendors JTurbo hand selected to produce the equipment used in JTurbo's process simulations and designs. JTurbo has been working with these vendors for eight years and all the vendors are under non-disclosure agreements with JTurbo.

---

[1] "Ex Works" is an international trade term that describes when a seller makes a product available at a designated location, and the buyer of the product must cover the transport costs.

*Confidential Information Shared with Joule in Confidence*

59.     JTurbo shared certain information – part of its trade secrets – in confidence, and not available to the public to Joule as Joule and JTurbo signed a non-disclosure agreement on or about April 1, 2021. *See* Exhibit 1. This was because of their belief that JTurbo and Joule were to be exclusive worldwide joint venture partnership to package and provide the JTurbo H2L IP technology and designs to the world.

60.     JTurbo H2L IP technology is the first of its kind, using low energy and cost-efficient technology to liquify hydrogen compared to all other hydrogen liquefaction technology on the market today.

61.     JTurbo's hydrogen liquefaction simulation platforms, if utilized in facilities, surpass all other similar liquefaction inventions in the market. JTurbo's system can achieve 5.2 kilowatts hour per kilograms (kWh/KG) of hydrogen compared to the current state of the art technologies available in the market which can only achieve 10-12 kWh/KG.

62.     The advantage of JTurbo's simulation was that it would look at a proposed liquefaction platform and identify how costs and energy input could be reduced for the end user – Joule's client.

63.     Once Thomas explained the general concept of what the JTurbo simulation could provide to Joule's clients, Joule was understandably motivated to work with Thomas and his company, JTurbo to be an exclusive purveyor of its methods.

64.     In a matter of a few weeks, JTurbo and Joule struck an accord about forming an exclusive worldwide joint venture partnership to sell the process to end users who were looking at building a liquefaction facility.  Joule would sell the deal, then JTurbo would run its simulations, based on what the end user (customer) wanted, to provide specifications for equipment, vendors

of product (expanders, for example), and optimal operating pressures for the end user's proposed facility.

65.     As the terms of their exclusive worldwide joint venture were essentially finalized, on or about February 8, 2022, JTurbo emailed Daniel Kennedy, the President of Joule, some of the revised process simulations with the updated performance data. *See* Exhibit 15. The revised process simulations contained Plaintiffs' trade secrets. Defendants used the process simulations and data that was developed by JTurbo, to advertise on Plug's LinkedIn page as a provider of hydrogen liquefactions. *See* Exhibit 16.

### *January 10, 2022, Consulting Agreement Required Thomas' Experience and Expertise*

66.     On or about January 10, 2022, Plug and Thomas executed a Consulting Agreement. *See* Exhibit 17 (Consulting Agreement).

67.     Thomas diligently worked with the parameters Plug provided him to continue provide valuable feedback on what Plug was doing, all the while being surprised at the lack of knowledge of their engineering team.

68.     The scope of services under the Consulting Agreement was a distinctly separate agreement with different scopes from the Amended Exclusivity and Design Fee Agreements.

69.     Plug knew that they needed the expertise of Thomas to further develop process their own hydrogen liquefaction plant units.

70.     Specifically, the consulting services were related to the further development of the implementation of the designs into their own hydrogen liquefaction plant units.

71.     The Consulting Agreement provided that Plug would pay Thomas $300 per hour for consulting services not to exceed 20 hours per week for a term of two years.

### *JTurbo Provided Enough to Satisfy Joule's Every Need; But not its Greed*

72.     Notwithstanding the express terms of the Consulting Agreement, on or about June 2022, after obtaining critical information from Thomas, Plug reduced the consulting services to 10 hours per week, eventually terminating Thomas' consulting services. *See* Exhibit 18. As of today, Defendants owe Thomas approximately $400,000 on the Consulting Agreement, lost profits that Thomas could have made had he worked through the term of the Consulting Agreement.

73.     Upon information and belief, Joule saw a more profitable venture with Plug, and sold itself and the secrecy it promised to JTurbo to Plug.

74.     The technology that Joule, a small engineering company of about 20 people, turning over a few million per year, was sold for several multiples of its topline to Plug.

75.     The only technological asset Joule, and now Plug, had of import as US Energy policy changes, is JTurbo's trade secrets.

76.     Joule and Plug knew that forcing Thomas out of the equation was the only way to leverage his technology and squeeze him out.

77.     Plaintiffs invested substantial time, expense, and effort into developing the JTurbo H2L IP, including the trade secrets, know-how, process simulations, process designs, and improvement and enhancements, only to have Defendants state it as their own. *See* Exhibit 16. The video on the LinkedIn page even showed the process design JTurbo developed. *See* Exhibit 16.

78.     Furthermore, Defendants have refused to pay JTurbo any fees for the use of JTurbo's H2L IP per the terms of the Amended Exclusivity Agreement or the $5 million that was promised to JTurbo. Joule has also refused to pay JTurbo the Technology and Design Development fee for the six units that were ordered from Joule.

79.     The evil that was done to JTurbo and Thomas is that they were brought to the table by Joule, and led to believe Joule could be trusted, when Joule with its conspirator, Plug, decided

to wreak havok on Thomas / JTurbo, taking that which Thomas has spent the better part of his life developing.

80.     This lawsuit is for recovery of compensation owed and recompense for Joule and its conspirator's betrayal.

## V.   CAUSES OF ACTION

*Count 1: Violations of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836*

81.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in this Complaint as if fully set forth herein. FED. R. CIV. P. 10(c).

82.     Trade secrets, as defined under the Defend Trade Secrets Act, includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C §1839(3). Two requirements must be met. First, the owner of the trade secret must have taken reasonable measures to keep such information secret. 18 U.S.C §1839(3)(A). Second, the information itself must derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C §1839(3)(B). An owner of a trade secret that is misappropriated may bring a civil action under the Defend Trade Secrets Act if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 U.S.C. § 1836(b)(1).

83.     Misappropriation means disclosure of use of a trade secret of another without express or implied consent by a person who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a

duty to maintain the secrecy of the trade secret or limit the use of the trade secret. 18 U.S.C. § 1836(5)(b)(ii)(II). Misappropriation also means acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret. 18 U.S.C §1839(5). Improper means includes theft or breach of a duty to maintain secrecy. 18 U.S.C §1839(6).

84.     JTurbo is the owner of trade secrets related to a product or services used in interstate and foreign commerce. JTurbo's trade secrets were composed of proprietary process design, process simulations, know-how, and improvements and enhancements to its hydrogen liquefaction technology developed by Thomas and which could be used for energy consumption. JTurbo's trade secrets also included its financial information, business operation methods, the identity of JTurbo's vendors and customers, and JTurbo's pricing.

85.     JTurbo derived independent economic value from its trade secrets not being generally known or readily ascertainable by legal means. JTurbo's hydrogen liquefaction system surpasses all other similar liquefaction inventions in the market. JTurbo's system can achieve 5.2 kilowatts hour per kilograms (kWh/KG) of hydrogen compared to the current state of the art technologies available in the market which can only achieve 10-12 kWh/KG. As a capital cost estimate, the JTurbo liquefaction cost is approximately $1,000 per KG whereas its nearest competitor is at $2,500 per KG, which is 150% more than JTurbo's costs. The economic value of JTurbo's trade secrets is evidenced by the six orders of hydrogen liquefaction plant units from various business entities, including Plug, Nikola, and TC Energy.

86.     JTurbo took steps that were reasonable under the circumstances to maintain the secrecy of the trade secrets. The technology, design, operation methods, and process simulations were known only to Joule and Plug, who agreed to not disclose to others the technical and business

information or to use that information to its own benefit. JTurbo also had a non-disclosure agreement (NDA) with Joule, Plug, and many more third parties who would be evaluating the JTurbo H2P IP technology. *See* Exhibits c. Furthermore, the confidentiality provisions of the Amended Exclusivity Agreement and NDA show that JTurbo used reasonable measures to keep the information a secret.

87.     Defendants misappropriated the trade secrets by selling hydrogen liquefaction plants incorporating JTurbo's trade secrets, including the process simulations, process designs, know-how, and improvements and enhancements, without discussing the fees with JTurbo or compensating JTurbo for each sale of the units. Pursuant to the Design Fee Agreement, Defendants were supposed to compensate Plaintiffs for use of the process design they created for Plug for the development of hydrogen liquefaction plant units. Also, pursuant to Section 4 of the Amended Exclusivity Agreement, Joule needed to license the JTurbo H2L IP from JTurbo for each project and pay for the license. However, Joule and Plug sold the units without consulting JTurbo in the dealings or paying them for the license/technology and design development fee.

88.     Defendants further misappropriated JTurbo's trade secrets by disclosing or using the trade secrets, including the process simulations, process designs, without express or implied consent of JTurbo when they knew they acquired under circumstances giving rise to a duty of confidentiality or to limit use of the trade secret. Joule knew at the time they entered into the Amended Exclusivity Agreement and NDA with JTurbo that there would be some information that must be kept a secret.

89.     Not only did Defendants sell these units, but they are also now marketing technology utilizing JTurbo's H2L IP, including process simulations, trade secrets, the process designs, know-how, and improvements and enhancements, to other business entities furthering their misappropriation.

90.     Defendants had the intent to convert the trade secrets, the process designs, know-how, and improvements and enhancements, and knew the offense would injure the owner of the of the trade secret.

91.     The misappropriation was also willful and malicious because Joule and Plug Power consciously disregarded the JTurbo's trade secret rights. They knew that the information provided by JTurbo was confidential pursuant to Section 4 in the Amended Exclusivity Agreement and NDA but still engaged in transactions without compensating or licensing the JTurbo H2L IP from JTurbo.

**Count 2: Misappropriation of Trade Secrets Under the Texas Uniform Trade Secrets Act**

92.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in this Compliant as if fully set forth herein. FED. R. CIV. P. 10(c).

93.     The elements of a cause of action for trade secret misappropriation are (1) the plaintiff owned a trade secret, (2) the defendant misappropriated the trade secret and (3) the misappropriation caused injury. TEX. CIV. PRAC. & REM. CODE § 134A.002.

94.     A trade secret is defined under the Texas Uniform Trade Secrets Act ("TUTSA") as "information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers. TEX. CIV. PRAC. & REM. CODE § 134A.002(6). A trade secret is further defined as "deriv[ing] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(A). Finally, a trade secret must be "…the subject of efforts that are reasonable under the circumstances to maintain its secrecy." TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(B).

95.     JTurbo is the owner of trade secrets, process simulations, process designs, know-

how, and improvements and enhancements, related to a product or services used in interstate and foreign commerce. JTurbo's trade secrets were composed of its proprietary hydrogen liquefaction technology developed by Thomas, and which could be used for energy consumption. JTurbo's trade secrets also included its technology, process designs, know-how, and improvements and enhancements, process simulations, financial information, business operation methods, the identity of JTurbo's vendors and customers, and JTurbo's pricing.

96.     JTurbo derived independent economic value from its trade secrets not being generally known or readily ascertainable by legal means. JTurbo's hydrogen liquefaction system surpasses all other similar liquefaction inventions in the market. JTurbo's system can achieve 5.2 kilowatts hour per kilograms (kWh/KG) of hydrogen compared to the current state of the art technologies available in the market which can only achieve 10-12 kWh/KG. As a capital cost estimate, the JTurbo liquefaction cost is approximately $1,000 per KG whereas its nearest competitor is at $2,500 per KG, which is 150% more than JTurbo's costs. The economic value of JTurbo's trade secrets is evidenced by the six orders of hydrogen liquefaction plant units from various business entities, including Plug, Nikola, and TC Energy.

97.     JTurbo took steps that were reasonable under the circumstances to maintain the secrecy of the trade secrets, process simulations, the process designs, know-how, and improvements and enhancements. The technology, design, operation methods, and financial information were known only to Joule, who agreed to not disclose to others the technical and business information or to use that information to its own benefit. JTurbo also had a non-disclosure agreement (NDA) with Joule, Plug, and many more third parties who would be evaluating the JTurbo H2P IP technology. *See* Exhibits 1, 3, 7, 8, 9, 10, 11, 12, and 13. Furthermore, the confidentiality provisions of the Amended Exclusivity Agreement and NDA show that JTurbo used reasonable measures to keep the information a secret.

98.     Defendants misappropriated JTurbo trade secrets, process simulations, the process designs, know-how, improvements, and enhancements, in violation of their duty to maintain secrecy and to limit use of the trade secrets. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(2), (3). Pursuant to the Design Fee Agreement, Defendants were supposed to compensate Plaintiffs for use of the process design they created for Plug for the development of hydrogen liquefaction plant units. Also, pursuant to Section 4 of the Amended Exclusivity Agreement, Joule needed to license the JTurbo H2L IP from JTurbo for each project and pay for the license. However, Joule and Plug sold the units without consulting JTurbo in the dealings or paying them for the license/technology and design development fee.

99.     Defendants further misappropriated JTurbo's trade secrets, process simulations, the process designs, know-how, and improvements and enhancements, by disclosing or using the trade secrets without express or implied consent of JTurbo. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(3)(B)(ii)(b).  Joule knew that it had an expressed and implied duty to maintain confidentiality or limit the use of trade secrets. Joule knew at the time they entered into the Amended Exclusivity Agreement and NDA with JTurbo that there would be some information that must be kept a secret.

100.    Not only did Defendants sell these units, but they are also now marketing technology utilizing JTurbo's H2L IP, including trade secrets, including the process simulations, process designs, to other business entities furthering their misappropriation.

101.    Defendants had the intent to convert the trade secrets, process simulations, the process designs, know-how, and improvements and enhancements, and knew the offense would injure the owner of the of the trade secret.

102.    The misappropriation was also willful and malicious because Joule and Plug Power consciously disregarded the JTurbo's trade secret rights. They knew that the information provided

by JTurbo was confidential pursuant to Section 4 in the Amended Exclusivity Agreement and NDA but still engaged in transactions without compensating or licensing the JTurbo H2L IP from JTurbo.

***Count 3: Breach of Contract of Amended & Restated Exclusivity Agreement in January 2022.***

103. Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in this Complaint as if fully set forth herein. FED. R. CIV. P. 10(c).

104. The elements of a cause of action for breach of contract are (1) a valid contract exists, (2) the plaintiff performed or tendered performance as contractually required, (3) the defendant breached the contract by failing to perform or tender performance as contractually required, and (4) the plaintiff sustained damages due to the breach. *Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

105. The Amended Exclusivity Agreement is an amendment to a contract, as it was signed and executed by both JTurbo and Joule Processing to amend the Original Exclusivity Agreement. The Amended Exclusivity Agreement supersedes the Original Exclusivity Agreement.

106. The Amended Exclusivity Agreement obligated Plaintiffs to license their JTurbo H2L IP to Joule, and in turn, Joule would sublicense JTurbo H2L IP to customers with the consent of Plaintiffs. Plaintiffs performed under the contract as they were contractually required to because Thomas had discussed and given Joule the JTurbo H2L IP technology and plant design.

107. However, Defendants have breached the contract by failing to perform their obligations under the Amended Exclusivity Agreement. Defendants were obligated to include Plaintiffs in the sale process of each Project that used the JTurbo H2L IP in the design, including JTurbo's trade secrets, process simulations, the process designs, know-how, and improvements and enhancements.

108.    Defendants were also obligated to pay Plaintiffs a License Fee and PDP fee for every Project that Joule would use JTurbo's process engineering design services and JTurbo H2L IP. Joule received six orders of liquefaction plants that used JTurbo H2L IP in the design, but Plaintiffs were not involved in the discussions with the buyers or were paid a license fee.

109.    Furthermore, Defendants have also breached the contract by not generating at least $5 million in gross revenue for JTurbo, as stated in Paragraph 11.b. *See* Exhibit 6. Defendants were obligated to generate at least $5 million in gross revenue in 5 years, which could include any license or sale of JTurbo H2L IP, Process Design Package (PDP), and other revenue of any kind or character. To date, Defendants have not generated any revenue for Plaintiffs. Instead, Defendants have used Plaintiffs' process simulations, the data in the process simulations, and process designs, meaning Defendants have taken away revenue from Plaintiffs.

110.    Plaintiffs sustained damages because they were not compensated based on the license fees due to them for every unit sold using the JTurbo H2L IP in the design. Defendants owed around $10,800,000 as lost revenue from the six hydrogen liquefaction units sold without compensating Plaintiffs to use the JTurbo H2L IP technology, including its trade secrets, process simulations, the process designs, know-how, and improvements and enhancements. Plaintiffs have also sustained damages based on Defendants' obligation to generate $5 million in gross revenue in 5 years, which Defendants have shown no signs of performing.

111.    Plaintiffs performed as contractually required. Defendants breached the contract by failing to include Plaintiffs in the discussion with buyers and not being compensated on the licensing fee. Plaintiffs have suffered damages because of Defendants' breach.

### Count 4: Breach of Design Fee Agreement

112.    Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in this Complaint as if fully set forth herein. FED. R. CIV. P. 10(c).

113.    The elements of a cause of action for breach of contract are (1) a valid contract exists, (2) the plaintiff performed or tendered performance as contractually required, (3) the defendant breached the contract by failing to perform or tender performance as contractually required, and (4) the plaintiff sustained damages due to the breach. *Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

114.    Parties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Levetz v. Sutton*, 404 S.W.3d 798, 803 (Tex. App.—Dallas 2013, pet. denied).

115.    The Design Fee Agreement is a contract, as it was written and agreed upon by both JTurbo and Plug. *See* Exhibit 4. The September 29, 2021, email states what was agreed upon in the meeting with Joule and JTurbo on that day. In the email, it states "The *agreed* "H2L technology development assistance fee" for JTurbo is $500k/unit ordered by Plug Power for up to the first three units." As the email states, the agreed upon terms were that there would be a Design Fee for the process designs of $500,000 per unit.

116.    The Design Fee Agreement obligated Joule to compensate JTurbo for the process designs that JTurbo would grant to Defendants to help develop hydrogen liquefaction plants. JTurbo performed under the contract when JTurbo handed over the process designs and process simulations, including the data, to Defendants. Defendants breached the Design Fee Agreement as a result of not compensating JTurbo for the designs that were provided to Defendants from JTurbo. As to date, Plaintiffs have not received any compensation for their process designs.

117.    Plaintiffs have sustained damages because they were not given compensation for the process designs that were provided to Defendants to use to help develop hydrogen liquefaction

plants for Plug. Defendants owe around $10,800,000 as lost revenue from the six hydrogen liquefaction plant units sold.

118.     Plaintiffs performed as required by providing the process designs and process simulations, including the data, to Defendants. Defendants breached the contract by failing to compensate for the process that was developed by Plaintiffs. Plaintiffs have suffered damages as a result of Defendants' breach.

### Count 5: Consulting Agreement

119.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in this Complaint as if fully set forth herein. FED. R. CIV. P. 10(c).

120.     The Consulting Agreement is a contract, as it was signed and executed by Plaintiff Jacob Thomas and the VP of Strategy and M&A of Plug Power, Kevin Kopczynski.

121.     The Consulting Agreement obligated Thomas to provide consulting services to Plug at a rate of $300 per hour up to 20 hours a week. Thomas performed under the contract as required by, as he provided consulting services related to the further development of and implementation of the hydrogen liquefiers. Specifically, he participated in design reviews and made reports to Plug for hydrogen liquefiers. Defendants breached the Consulting Agreement because they did not fully compensate Thomas for his consulting services. As of to date, Plug has only paid Thomas $200,000 under the terms of the Consulting Agreement. *See* Exhibit 19.

122.     Thomas has sustained damages in the amount of $400,000 of lost profits if he were to have performed until the end of the contract term.

123.     Thomas performed as contractually required. Plug breached the contract by failing to compensate Thomas what he is owed by Plug for his consulting services. Thomas has suffered damage as a result of Plug's breach.

### Count 6: Tortious Interference with Prospective Business Relationships

124.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in this Complaint as if fully set forth herein. Fed. R. Civ. P. 10(c).

125.     The elements for tortious interference with prospective relations are (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third person, (2) the defendant intentionally interfered with the relationship, (3) the defendant's conduct was independently tortious or unlawful, (4) the interference proximately caused the plaintiff's injury, and (5) the plaintiff suffered actual damage or loss. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

126.     There is a reasonable probability that JTurbo would have entered into a business relationship with prospective businesses to sell its services. Defendants knew that if they did not include Plaintiffs in the discussions of selling their units of liquefaction plants it would interfere with Plaintiffs' prospective clients or knew that their actions were certain or substantially certain to cause interference.

127.     Defendants have used Plaintiffs' JTurbo H2P IP technology, including its trade secrets, process simulations, the process designs, know-how, and improvements and enhancements, to obtain clients knowing that it would damage Plaintiffs. Plaintiff was damaged every time Defendants would exclude Plaintiff in the sale of the liquefaction plants units without compensating them for using the JTurbo H2P IP technology in the design.

### Count 7: Unfair Competition

128.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in this Complaint as if fully set forth herein. Fed. R. Civ. P. 10(c).

129.     The elements of a cause of action for unfair competition by misappropriation are (1) the creation of plaintiff's product (i.e., the trade secret information) through extensive time, labor, skill, and money; (2) the defendant's use of that product in competition with the plaintiff,

thereby gaining a special advantage in that competition (i.e., a 'free ride') because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff." *BP Automotive, L.P. v. RML Waxahachie Dodge, L.L.C.*, 448 S.W.3d 562, 572 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

130.    JTurbo developed the trade secrets, including process simulations, the process designs, know-how, improvements, and enhancements. It took JTurbo years to develop the designs and trade secrets, spending time and money to perfect the JTurbo H2L IP technology.

131.    In Plug's LinkedIn post, Plug portrays that they are the owners of the JTurbo's design and H2L IP technology. *See* Exhibit 16. Plug has been engaging in unfair competition and unfair trade practices against JTurbo by marketing and advertising that they are the owners of the JTurbo H2L IP technology and process simulations of hydrogen liquefiers with little to no expense incurred in developing the technology.

132.    Plug took JTurbo's protected and secret information to undercut Plaintiff in the Cryogenic Liquefaction market, causing commercial damage.

### Count 8: Joule's Breach of Fiduciary Duty

133.    Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in this Complaint as if fully set forth herein. FED. R. CIV. P. 10(c).

134.    The elements of a cause of action for breach of fiduciary duty are (1) the plaintiff and defendant had a fiduciary relationship, (2) the defendant breached its fiduciary duty to the plaintiff, (3) the defendant's breach resulted in (a) injury to the plaintiff, or (b) benefit to the defendant. *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999). Partners owe certain fiduciary duties to other partners within the partnership, such as the duty of loyalty and the duty of care. Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 199 (Tex. 2002); Nguyen, 507 S.W.3d at 379.

135.    Joule and JTurbo were exclusive partners to provide and package the JTurbo H2L IP technology, process simulations and designs worldwide under the Amended Exclusivity Agreement. In other words, the partnership was formed to exploit Thomas' technology with Joule's market contacts. This joint venture and collaboration would greatly benefit both parties.

136.    As exclusive partners, Joule had a fiduciary duty to not disclose JTurbo's trade secrets, process simulations, and designs. Joule knew that it had an expressed and implied duty to maintain confidentiality or limit the use of trade secrets. Joule knew at the time they entered into the Amended Exclusivity Agreement and NDA with JTurbo that there would be some information that must be kept a secret.

137.    JTurbo trusted Joule with JTurbo's trade secrets, including process simulations, process designs, know-how, improvements, and enhancements. This was on the belief that they would be exclusive partners in the long run and each benefit from the partnership.

138.    JTurbo entrusted Joule with negotiations and sales of the JTurbo H2L IP technology and process simulations. Rather than represent JTurbo's best interests, Joule put their best interests first and breached their fiduciary duty to JTurbo to JTurbo's detriment. Joule not only disclosed JTurbo's trade secrets to Plug, but Joule and Plug are now claiming that they are the owners of those trade secrets, including the process simulations and process designs.

139.    JTurbo justifiably placed its trust in Joule. Joule has breached that trust and the fiduciary duty to JTurbo by failing to place JTurbo's best interests before Joule's own self-interest. Accordingly, JTurbo sustained damages as a result of Joule's breach of fiduciary duty to not disclose JTurbo's trade secrets. JTurbo seeks to recover in this suit, in an amount within the jurisdictional limits of this Court.

140.    JTurbo alleges herein that Defendant Joule knowingly or recklessly violated their fiduciary duties by disclosing JTurbo's trade secrets and claiming it as their own.

***Count 9: Plug's Conspiracy to Commit Breach of Fiduciary Duty***

141.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in this Complaint as if fully set forth herein. FED. R. CIV. P. 10(c).

142.     In Texas, a party who knowingly participates in another's breach of fiduciary duty may be liable for the breach as a joint tort-feasor. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942). Under Texas law, an actionable civil conspiracy occurs when there is a "combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *See Firestone Steel Prods. Co v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996).

143.     Joule and JTurbo were exclusive partners to provide and package the JTurbo H2L IP technology, process simulations and designs to customers worldwide. When Plug acquired Joule, Plug became a successor in interest. Meaning that Plug knew that Joule had a fiduciary duty to not disclose JTurbo's trade secrets, process simulations, and designs.

144.     Plug conspired with Joule to obtain JTurbo's trade secrets, process simulations, and designs. Plug knowingly participated in Joule's breach of fiduciary duty to JTurbo to not disclose JTurbo's trade secrets, process simulations, and process designs. Plug obtained those trade secrets, process simulations and designs from Joule in order to not have to compensate JTurbo for them.

145.     JTurbo sustained damages as a result of Plug's acts to conspire with Joule to obtain JTurbo's trade secrets, process simulations, and process designs.

## VI. DAMAGES & ATTORNEYS' FEES

146.     Plaintiffs seek to recover their actual and consequential damages in this suit, in an amount within the jurisdictional limits of this Court. Plaintiffs seek exemplary damages against Defendants as Defendants' actions were committed with malice as defined by Chapter 41 of the Texas Civil Practice & Remedies Code.

147.    Plaintiffs are entitled to reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(D) (Defend Trade Secrets Act) and TEX. CIV. PRAC. & REM CODE ANN. § 134A.005 (Texas Uniform Trade Secrets Act).

148.    Plaintiffs are entitled to an award of attorney's fees under 18 U.S.C. § 1836(b)(3)(D) and TEX. CIV. PRAC. & REM CODE ANN. § 134A.005 as Plaintiffs have shown that the misappropriation was made in bad faith and the trade secret was willfully and maliciously misappropriated. As a result of Defendants' conduct, Plaintiffs were forced to retain the undersigned counsel to pursue these causes of action.

149.    Plaintiffs seek to recover their reasonable attorneys' fees and costs, along with pre-judgment and post-judgment interest, under the provisions of Chapter 38 of the Texas Civil Practice & Remedies Code or as otherwise allowed by law.

## VII. JURY DEMAND

150.    Plaintiffs respectfully demand the right to have a trial by jury and hereby tender the appropriate jury fee to the district Clerk of Court for the U.S. District Court for the Western District of Texas.

## VIII. PRAYER

151.    For these reasons, Plaintiffs ask that the Court issue citation for Defendants to appear and answer, and that Plaintiffs be awarded judgment against Defendants for the following:

1. Actual, consequential and exemplary damages, as allowed by law;

2. Pre-judgment and post-judgment interest;

3. Reasonable attorneys' fees and costs of court;

4. All other relief to which Plaintiffs may show themselves to be entitled to, in law or in equity.

Respectfully submitted,

THE VETHAN LAW FIRM, PC

By: /s/ *Charles M. R. Vethan*
Charles M. R. Vethan
Attorney-in-Charge
Texas Bar No.  00791852
Joseph L. Lanza
Texas Bar No. 00784447
Two Memorial City Plaza
820 Gessner, Suite 1510
Houston, Texas 77024
Tel: (713) 526-2222
Fax: (713) 526-2230
Email: edocs@vwtexlaw.com

**Attorneys for Plaintiffs**